IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

GERALD MULLINS, JR.,

                    Plaintiff,

          v.                                    Civil Action No. 1:06-CV-11

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**


**I. Introduction**

A.    Background

          Plaintiff, Gerald Mullins, Jr., (Claimant), filed his Complaint on January 24, 2006,

seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on April 11,

2006.[2]   Claimant filed his Motion for Summary Judgment on May 12, 2006.[3]  Commissioner

filed her Motion for Summary Judgment on June 9, 2006.[4]

B.    The Pleadings

               1.    Claimant's Motion for Summary Judgment.

_____

          [1] Docket No. 1.

          [2] Docket No. 5.

          [3] Docket No. 7.

          [4] Docket No. 10.

2. <u>Commissioner's Motion for Summary Judgment</u>.

C.     <u>Recommendation</u>

I recommend that:

1.     Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED so the ALJ may analyze the effect of Claimant's substance abuse separately from the effect of Claimant's failure to follow the treatment his doctors prescribed.

2.     Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II. Facts

A.     <u>Procedural History</u>

Claimant filed his fourth application for a Period of Disability, Disability Insurance Benefits, and Supplemental Security Income payments on February 26, 2003, alleging disability since May 30, 2001. The previous three applications had all been denied at the initial level of consideration, with no higher review requested. The current application was denied initially and on reconsideration. Claimant requested review by an ALJ and received a hearing before an ALJ on September 1, 2004. The ALJ ruled against Claimant on November 1, 2004. Claimant filed a request for review from the Appeals Council, but it denied this request on November 25, 2005. Claimant timely filed this action, which proceeded as set forth above.

B.     <u>Personal History</u>

Claimant was 34 years old on the date of the September 1, 2004 hearing before the ALJ. Claimant has a high school equivalent education. Claimant has prior relevant work experience a

construction worker.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: May 30, 2001 – November 1, 2004.[5]

**Cheryl France, M.D., 10/9/97, Tr. 146**
Admission diagnosis:
Axis I: polysubstance dependence, polysubstance induced mood disorder
Axis II: anti-social personality disorder
Axis III: status post self-inflicted injury to the left hand
Axis IV: Stressors: moderate to severe
Axis V: GAF: 72 %

Discharge diagnosis:
Axis I: polysubstance dependence, polysubstance induced mood disorder
Axis II: anti-social personality disorder
Axis III: status post self-inflicted injury to the left hand
Axis IV: Stressors: moderate to severe
Axis V: GAF: 72 %

**John Brick, M.D., 8/28/97, Tr. 148**
Diagnosis: disrhythmia grade I generalized
Clinical interpretation: The EEG shows mild generalized non-specific abnormalities during
wakefulness.  During sleep no specific epileptiform activity was activated.

**Martin L. Boone, Ph.D., 8/28/97, Tr. 151**
Conclusions: Cognitive functions are generally functioning within expected parameters.

**Jafar Almashat, M.D. and Scott Pollard, M.D., 8/18/97, Tr. 155**
Diagnostic impression:
Axis I: polysubstance dependence, substance induced mood disorder, depressed features
Axis II: anti-social personality traits
Axis III: status post self-inflicted injury to the left hand

---

[5] Much of the evidence in the record comes from before Claimant's alleged onset date of
disability.  Commissioner asserts this evidence is relevant "for background purposes only."
Def.'s Br. at 2.  Yet this is incorrect, as evidence obtained prior to the alleged onset date may be
relevant to the instant claim.  See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-
Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp.
2d 269, 272 (S.D.N.Y. 2004).

Axis IV: problems with primary support group and social problems
Axis V: GAF: 50 %

**Sharon Phares, M.S.W., 9/4/97, Tr. 160**
Provisional diagnosis:
Axis I: rule out post-traumatic stress disorder, polysubstance dependence, explosive disorder versus mood disorder secondary to substance abuse
Axis II: deferred
Axis III: no problems
Axis IV: poor anger control, poor coping skills, no job, no income, substance abuse history, unresolved issues from childhood
Axis V: highest level of adaptive functioning, past year: 55, current year: 40

**Laura Hathaway, P.A.-C. And Eamon Renaghan, M.D., 8/15/97, Tr. 168**
Diagnostic impression:
Axis I: polysubstance abuse, in remission times one month
Axis II: personality disorder with borderline anti-social traits
Axis III: sutures in left hand

**Jackson William Kiser, M.D., 11/27/00, Tr. 192**
Impression: there appears to be a non-united chronic fracture through the lateral epicondyle. There are several degenerative calcifications seen lateral to the radiocapitellar joint.

**Bruce Banning, M.D., 5/30/01, Tr. 200**
Impression: extensive sinusitis with acute features in the right frontal sinus

**Ghassan Bizri, M.D., 2/17/03, Tr. 226**
Principal admitting diagnosis: bipolar disorder
Secondary admitting diagnosis: history of alcohol dependence, polysubstance abuse, personality disorder
Principal diagnosis: bipolar disorder, type 1
Secondary diagnosis: history of alcohol dependence, history of polysubstance abuse, personality disorder

**Ghassan Bizri, M.D., 2/8/03, Tr. 234**
Diagnostic impression:
Axis I: bipolar disorder, type 1, alcohol dependence, polysubstance abuse
Axis II: personality disorder
Axis III: laceration of the right arm with four stitches
Axis IV: unemployed, financial problems, cannot see children, social support
Axis V: 40

**Dana Olson, M.D., 2/13/03, Tr. 236**
Impression: minimal lumbar degenerative changes

**Arturo Lumapas, M.D., 2/15/03, Tr. 242**
Diagnoses:
Axis I: oxycontin and dilaudid dependence, alcohol abuse and dependence
Axis II: borderline and anti-social traits
Axis III: healing left orbital contusion
Axis IV: psycho-social stressors, mild to moderate
Axis V: GAF 40-45

**Kiran Devaraj, 2/15/03, Tr. 248**
Diagnoses:
Axis I: major depressive disorder, recurrent, with psychotic features, polysubstance dependence, alcohol dependence, R/O substance-induced mood disorder, R/O bipolar disorder with psychotic features
Axis II: anxiety disorder, R/O anti-social and borderline personality disorders

**Physical Residual Functional Capacity Assessment, 4/14/03, Tr. 254**
Exertional limitations: none established
Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Dale M. Rice, M.A., 5/8/03, Tr. 262**
Diagnostic impression:
Axis I: bipolar II disorder, depressed, severe with psychotic features, alcohol abuse
Axis III: back and left shoulder problems, by self-report

**Psychiatric Review Technique, 6/10/03, Tr. 267**
The patient has disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: depressive syndrome characterized by: anhedonia or pervasive loss of interest in almost all activities, psychomotor agitation or retardation, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, hallucination, delusions, or paranoid thinking

The patient has anti-social/ borderline traits

The patient has behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.

Functional limitations:
        Restrict of activities of daily living and difficulties in maintaining concentration, persistence, or pace: mild

Difficulties in maintaining social functioning: moderate
Episodes of decompensation, each of extended duration: one or two

## Mental Residual Functional Capacity Assessment, 6/10/03, Tr. 281
Understanding and memory

The ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions, and the ability to understand and remember detailed instructions: not significantly limited

Sustained concentration and persistence

The ability to carry out very short and simple instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions: not significantly limited

The ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited

Social interaction

The ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

The ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes: moderately limited

Adaptation

The ability to respond appropriately to changes in the work setting, the ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places or use public transportation, the ability to set realistic goals or make plans independently of others: not significantly limited

## James Lee, M.D., 8/14/03, Tr. 285
Pre-operative diagnosis: left long finger flexor digitorum profundus zone 2 laceration
Postoperative diagnoses: left long finger digitorum profundus zone 2 laceration, left long finger flexor digitorum superficialis laceration zone 2

## Physical Residual Functional Capacity Assessment, 10/23/03, Tr. 287
Exertional limitations: none established
Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established

Communicative limitations: none established
Environmental limitations: none established

**Psychiatric Review Technique, 10/28/03, Tr. 295**
The patient has disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, psychomotor agitation or retardation, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, and hallucinations, delusions, or paranoid thinking.

The patient has personality D/O, NOS, borderline anti-social features

The patient has behavioral changes or physical changes associated with the regular use of substances that affect the general nervous system.

Functional limitations
    Restrictions of activities of daily living: moderate
    Difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace: marked
    Episodes of decompensation, each of extended duration: one or two

**Psychiatric Review Technique, 10/28/03, Tr. 309**
The patient has depressive disorder.

The patient has personality disorder NOS.

Functional limitation
    Restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace: mild
    Episodes of de-compensation, each of extended duration: none

**Walter Byrd, M.D., 2/26/04, Tr. 379**
Physician's diagnosis:
Axis I: mood disorder, NOS, with psychotic features, past history of alcohol dependence, past history of marijuana abuse
Axis II: deferred
Axis III: multiple lacerations of arms and thigh, non-acute at this point
Axis IV: severe stressors, decreased social support and lack of consistent vocation or living situation
Axis V: GAF = 55, highest in the past year estimated at 60

**Nikolaj Wolfson, 5/10/04, Tr. 396**
Impression: oblique fracture left 2nd metacarpal with no change in alignment

**Ghassan Bizri, M.D., 3/8/02, Tr. 397**
Admission impression:
Axis I: depression, alcohol dependency
Axis II: personality disorder, status post cutting his arm and stitches
Axis III: none
Axis IV: financial, housing
Axis V: 35

Principal diagnosis: bipolar disorder, type 1
Secondary diagnosis: alcohol dependency, personality disorder

**Muhammad Salman, M.D., 8/15/04, Tr. 408**
Diagnostic impression:
Axis I: schizoaffective disorder, depressed type
Axis II: deferred
Axis III: status post cut wounds on right arm
Axis IV: severity of stressors: moderate – difficulty with primary support group
Axis V: GAF: 20\

**Muhammad Salman, 8/13/04, Tr. 410**
Assessment: schizoaffective disorder, chronic left shoulder pain/dislocation, chronic back pain, lacerations to left upper arm, though only one is sutured

**Adnan Nahla, 8/11/04, Tr. 414**
Impression: remote trauma to the 2nd metacarpal an possible the 3rd metacarpals.

**Earnest Guy, 1/15/04, Tr. 417**
Diagnosis: depressive disorder NEC, alcohol dependence NEC/NOS – unspecified, cannabis abuse – episodic, tobacco use disorder, personality disorder NOS, Hx of past non-compliance, periapical abscess

**E. Sam Guy, M.D., 1/15/04, Tr. 419**
Diagnosis:
Axis I: depressive disorder, not otherwise specified, alcohol dependence, marijuana abuse, nicotine dependence, non-compliance with medical treatment
Axis II: personal disorder, not otherwise specified
Axis III: lacerations right upper arm and left thigh
Axis IV: psychosocial stressors, severe, homeless, jobless, financial problems, lack of primary support systems
Axis V: GAF 60 current, on admission 50

**E. Sam Guy, M.D., 1/7/04, Tr. 421**
Impression:
Axis I: mood disorder, not otherwise specified with emotional lability, alcohol dependence,

marijuana abuse, nicotine dependence, disability syndrome, non-compliance with medical treatment
Axis II: personality disorder not otherwise specified with cluster B traits
Axis III: lacerations right upper arm, left thigh
Axis IV: psychosocial stressors severe, homeless, jobless, financial problems, lack of primary support system
Axis V: GAF od 50

**E. Sam Guy, M.D., 1/7/04, Tr. 424**
Impression:
Axis I: alcohol dependency by history with current abuse to consist of binge drinking and polysubstance abuse by history
Axis III: none
Axis IV: "Life" and problems getting medications as well as issues involved with mental illness
Axis V: GAF = 45 on admission

**Nikolaj Wolfson, 8/26/04, Tr. 518**
Impression: partial avulsion and tear of the inferior glenoid labrum, but the ligament is intact with the labrum.

D.    Testimonial Evidence

Testimony was taken at the September 1, 2004 hearing.  The following portions of testimony are relevant to the disposition of this case.

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q    Mr. Mullins, why aren't you able to work?

A    I just have all kinds of problems.  I get around  people, I can't seem to function well.  I get nervous.  I have panic attacks, anxiety attacks.  I can't get along with people.  I just - - to myself, I would rather be alone because I'm actually in a state of fear or scared when I'm around a bunch of people or too many people.  I don't like to deal with people because I just - - I'm not sure how to explain it.  I don't know why things go on the way they do.  That's why I try to get help but -    Q    Well, what happens when you're around people?

A    I start feeling that people are out to get me, or people are always watching me, or

something is going to happen to me.  I get real jittery, nervous.  Sometimes I have crying spells.

For what reason, I don't know.  I'm just on end, actually.  Like I said, it's hard to explain it.

Actually, I can't explain it at all.  I don't know what's going on.  That's why I tried to go through

counselors and stuff to find out what's wrong and get help.

Q    How do you react to those things?

A    Sometimes I just try to hide and then sometimes I wind up hurting myself or doing

things that I wouldn't normally do, things I don't want to do.  Just different things.

Q    Like what?

A    I don't really - - what do you want to know?  I'm sorry.

Q    That's all right.  You've got - - there are notes from when you have been in the

hospital - -

A    Yes.

Q    - - and there are notes in the file about voices.

A    Yes.  I hear voices.

Q    Can you tell me about that?

A    I pretty much hear them all the time.  When I'm taking medication, they're not as

bad and I don't act on them.  But like I said, they're always telling me that things are going on

elsewhere or with my family, something is happening to someone or something is going to

happen to me, or people are trying to get me; I need to be on watch.  They tell me to hurt people.

They tell me to hurt  myself.  They just tell me that life is really going nowhere and it's worthless.

And - -

Q    Do you act on those voices telling you to do things?

10

A       Yes, sometimes.

Q       What have you done?

A       I cut myself.

Q       And how often has that happen?

A       Several times.  I couldn't even really put a number to it.

Q       Why do you do that?

A       Because when I hurt myself, it's like - - when I cut myself - - it's like I can feel a release through when I hurt myself.  And I feel that it's better to hurt myself than to hurt someone else.

Q       And have you hurt other people?

A       In the past.

Q       How recently?

A       Maybe a month ago.

Q       What happened a month ago?

A       I got into a fight.

Q       How often has that happened in the past?

A       I usually - - I have confrontations with people and a lot of times, I try to get away from it before something does escalate or something bad happens.  I don't like to be in trouble.  I don't like violence.  It scares me.  I'm always scared for my well-being as well as other people's, because sometimes, when I go into fits, I don't really know what's happening.

                        *                *                *

Q       Now, if you were to go to a job where you didn't have to be around a lot of people

- - there'd be people maybe in the room but not somebody you'd have to work real closely with.

A      Um-hum.

Q      How do you think - - do you think the problems that you're continuing to have would interfere with your ability to actually do something eight hours a day?

A      I think they would.

Q      How do you think they would?

A      Because I just seem - - for some - - I wander off, lose attention and things.  I seem to be going off where I'm not supposed to be.  I can't keep a straight pattern of thought.  I  lose track of what I'm doing.  I forget what I'm supposed to do. I do it a lot.  I'll go somewhere and then I'll forget why I'm there.

Q      Can you give me an example of the things that you've tried to do that - - where you know that these things have happened?

A      Like - - I don't understand.

Q      Like are there any examples of what - - some things that you've tried to do but your attention has caused a problem being able to focus on it?

A      Basically, just about everything that I do.  I mean - - yeah.  Really, just about everything that I do, I'll lose attention or I'll lost interest or whatever in it.  I forget what I'm doing.  You know, one time I was cutting a friend of mine's grass and I went looking for the gas can.  And I'm standing in the garage and I don't - - I forgot why I was there.  And I didn't even finish cutting the grass.  I just went back in the house because I forgot why I was in the building.

Q      Are you comfortable around friends?

A      Not really.

Q        Are you able to do - - when you do have a place to stay, are you able to do chores around the house and take care of yourself, take care of your stuff, and that sort of thing?

A        When it needs to be done, yeah, I can take care of - - I mean I don't do a whole lot, but yeah, I can take care of myself.

*                    *                    *

BY ADMINISTRATIVE LAW JUDGE:

Q        Mr. Mullins, it's an unfortunate situation.  You're living in that building, but what do you do during the day?

A        Basically, read books.

Q        What kind of books do you read?

A        Westerns.

Q        Where do you get them?

A        The library.

Q        So do you go to the library in Fairmont?

A        Fairview.

Q        Fairview.

A        Yes, sir.

Q        And do you walk there?

A        Yes, sir.

Q        Okay.  Do you see your children?

A        No, sir.

Q        What do - - when you're not reading do you go anywhere else?

A        Very rarely.

Q        What made you so mad that you hit a tree with your fist in April?

A        Voices laughing at me, taunting me, telling me that - - basically, the same thing that they always tell me, that I'm never going to get rid of them.

Q        Were you drinking that day?

A        No, sir.

Q        Was that your last episode of anger from the voices, or did you have another one since April of '04, before you went into Fairmont in August of '04?  Do you remember?

A        I don't really recall.

*                    *                    *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q        How would you describe construction worker?

A        Okay.  Construction Worker I is recognized as a heavy exertional, specific vocational preparation of 4, therefore semi-skilled.  His testimony indicated he was lifting up to 200 pounds at times.  He was performing at the very heavy exertional level.

Q        Assume an individual with no non-exertional - - with no exertional limitations rather, precluded from performing all but the following.   Unskilled low stress work, one and - - defined as one and two-step processes, routine and repetitive tasks, primarily working with things rather than people, entry-level.  With those limitations could you describe any work this hypothetical individual can perform?

CLMT        Are you asking me?

ALJ         Are you looking for housing, Mr. Mullins?

14

CLMT        Yes, sir.

ALJ         Is the social services network helping you get an apartment?

CLMT        Not at this - - not at the moment.  I was trying to contact them.  When I was going to Valley and with my other counselor, she was working trying to find me a place through the Morgantown Housing something.  I'm going to try to go through them again.

ALJ         Okay.  Mr. Czuzsman?

VE          Okay.  The following at the medium exertional.  Work as a trash collector.  There are 75,000 national, 500 regional.  Trimmer, printed circuit board panels.  Also medium exertional.  57,000 - -

ATTY        I'm sorry?  Printed - -

VE          Printed circuit board panels.  There are 57,000 national and you have 200 regional.  Also medium, launderer.  150,000 national, over 1,000 regional.  At the light exertional working as a garment bagger you have 105,000 national and for the region 800.  Mold preparer, 40,000 - -

ATTY        I'm sorry, what preparer?

VE          Mold preparer.

ATTY        M-o-u-l-d?

VE          M-o-l-d preparer.

ATTY        Okay.

VE          You have 40,000 national.  For the region you have 50.

BY ADMINISTRATIVE LAW JUDGE:

Q       Are those jobs consistent with The Dictionary of Occupational Titles?

15

A	Yes, they are, Your Honor.

Q	Sir, if the Claimant cannot stay on task because of his other psychoses that he's taking medication for, mental disorder, 1/3 to 2/3 of the time, are those jobs impacted?

A	Yes, they are, sir.

Q	To what extent?

A	He wouldn't be able to perform the jobs.

Q	If attendance is an issue and he were to have missed working during a particularly bad mental status days, so to speak, and he were to miss two days consistently is that a tolerable limit of absenteeism in a month's time?

A	Two days is the limit.

Q	Okay.  So more than two days would be problematic?

A	Yes. Yeah.  If it was consistent then more than two days would be.  Yes.

ALJ	Okay.  Ms. Carpenter?

ATTY	If he were off task even an hour unscheduled out of the workday outside of breaks and lunch periods due to his - - the psychiatric symptoms how would that affect?

VE	It would prevent him from being effective at full-time work.

*	*	*

E.	Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•	Has a driver's license (Tr. 42)

- Uses marijuana (Tr. 55)

- Washes, bathes, dresses, and shaves himself (Tr. 112)

- Reads books two to three hours per day (Tr. 114)

- Swims, hunts, fishes, and engages in other sporting activities (Tr. 114)

- Attends concerts (Tr. 114)

- Has used methamphetamines, crack cocaine, cocaine, opiates, and benzodiazepines in the past (Tr. 232)

- Alcohol abuse (Tr. 245)

- Smokes one and a half to two packs of cigarettes per day (Tr. 421)

### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ's conclusions regarding his mental impairments lack factual support in the record.

Commissioner argues the ALJ's decision has substantial evidence to support it. Commissioner contends the ALJ properly evaluated the evidence to find Claimant not entitled to benefits.

B.    <u>The Standards</u>.

1.    <u>Summary Judgment</u>.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.   Judicial Review. Only a final determination of the Commissioner may receive judicial review. See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.   Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.   Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.   Disability Prior to Expiration of Insured Status- Burden. In order to receive disability insurance benefits, an applicant must establish that he was disabled before the

expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can

perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.      Discussion

        The ALJ's Evaluation of the Evidence Concerning Claimant's Mental Impairments

        Claimant presents only one issue for the Court's consideration.  Claimant argues that the ALJ erred in finding his drug addictions play a material role in aggravating his mental impairments.  Claimant argues that his mental impairments exist aside from any substance abuse problems he may have.  Commissioner argues the ALJ properly considered the evidence to determine Claimant is not entitled to benefits.

        As mentioned above, this Court must uphold the ALJ's findings as long as they have substantial evidence to support them.  Hays, 907 F.2d at 1456.  It is the duty of the ALJ, not the courts, to make factual findings and "resolve conflicts in the evidence."  Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996).  Substantial evidence is simply "evidence which a reasoning mind would accept as sufficient to support a particular conclusion . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

        The ALJ found Claimant disabled under 12.09B of the medical listings. (Tr. 21).  When a person meets the disability requirements of a medical listing, he is presumed disabled and no

further inquiry into whether disability exists is necessary.  20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii).

The ALJ correctly noted, however, that when a person is found disabled, he may still not be entitled to benefits if substance abuse plays a material role in causing the impairment.  (Tr. 21); 20 C.F.R. §§ 404.1535; 416.935.  Under the Regulations, a person otherwise disabled is not entitled to benefits if addiction to drugs or alcohol "is a contributing factor material to the determination of disability."  20 C.F.R. §§ 404.1535(a); 416.935(a).  The inquiry centers around "whether we would still find you disabled if you stopped using drugs or alcohol."  20 C.F.R. §§ 404.1535(b)(1); 416.935(b)(1).  The ALJ must determine which limitations "would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling."  20 C.F.R. §§ 404.1535(b)(2); 416.935(b)(2).  If the person's limitations aside from substance abuse would still be disabling, the person is entitled to benefits; if the limitations would not be disabling, he is not.  20 C.F.R. §§ 404.1535(b)(2); 416.935(b)(2).

The ALJ found Claimant's substance abuse a material contributing factor in his disability and therefore found Claimant not entitled to benefits under the medical listings.  (Tr. 26).  The ALJ determined that while Claimant had severe mental impairments aside from substance abuse, they were not of such severity as to meet listing 12.09B.  Id.  The ALJ's findings will be upheld as long as substantial evidence exists to support them.  Hays, 907 F.2d at 1456.

After reviewing the evidence, the Court finds substantial evidence does not support the ALJ's conclusions.  The ALJ has impermissibly intermingled his analysis of how Claimant's substance abuse problems affect his condition with an analysis of how Claimant failed to follow the treatment prescribed by his doctors.  Cf. Sousa v. Callahan, 143 F.3d 1240, 1245 (9th Cir.

1998) (remanding a case where "the [district] court failed to distinguish between substance abuse contributing to the disability and *the disability remaining after the claimant stopped using drugs or alcohol*") (emphasis in original). These are separate and distinct grounds for denying disability benefits. 20 C.F.R. §§ 404.1530; 404.1535; 416.930; 416.935. The ALJ presented a comprehensive analysis of how Claimant's condition could significantly improve. (Tr. 21-26). Yet much of the evidence the ALJ analyzed as showing how Claimant's substance abuse affects his condition in fact demonstrates how Claimant should have done better in following the treatment ordered by his doctors. (Tr. 21-26). While it would be tempting for the Court to conduct its own analysis of this evidence, the Court must bear in mind that the ALJ is the finder of fact and that the Court cannot affirm the ALJ on different legal grounds than those used by the ALJ. Smith, 99 F.3d at 638; Preston v. Heckler, 769 F.2d 988, 990 (4th Cir. 1985).

The Court will now give some brief examples of how the ALJ confused his analysis of the effect of Claimant's substance abuse on his condition with an analysis of how Claimant failed to follow treatment. On page 21, the ALJ states that Claimant was admitted to the hospital in 1997 for a disorder caused by substance abuse. He soon afterward notes "the claimant failed to follow up with outpatient mental health therapy and treatment for his polysubstance abuse or mood disorder, and quit taking medication, another repeated theme in the claimant's treatment records." Id. The fact that Claimant's condition was caused by substance abuse concerns how his condition might be different if not for substance abuse. Yet the failure to follow through with treatment has nothing to do with how Claimant's condition would be better aside from substance abuse. Claimant's condition without substance abuse might still meet disability requirements. The Regulations recognize this reality. 20 C.F.R. §§ 404.1535; 416.935 (permitting a finding of

disability where a claimant is disabled "independent of your drug addiction or alcoholism). On page 25, the ALJ mentions Claimant went to the emergency room and reported he "continued to drink alcohol even though it makes him become 'violent.'" The ALJ then relates Claimant was "released in stable condition with prescribed medication." Id. Again, the fact of Claimant's substance abuse and the resulting unfavorable consequences are separate from how Claimant's condition may improve with medication. Unfortunately, the ALJ treats them under one heading. The above two examples are indicative of similar errors throughout the ALJ's opinion.

Upon remand, the ALJ should consider separately the effects Claimant's substance abuse had on his condition from how his condition may improve with medication, yet did not given Claimant's failure to follow treatment orders. 20 C.F.R. §§ 404.1530; 404.1535; 416.930; 416.935. Either ground may result in a denial of disability benefits. 20 C.F.R. §§ 404.1530; 404.1535; 416.930; 416.935.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED so the ALJ may analyze the effect of Claimant's substance abuse separately from the effect of Claimant's failure to follow the treatment his doctors prescribed.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk

of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: January 5, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE